**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bert Glenn MUNZ, Defendant-Appellant.**

**No. 75–1327.**

United States Court of Appeals, Tenth Circuit.

Oct. 26, 1976.

Robert M. Anderson, Salt Lake City, Utah, for defendant-appellant.

Rodney G. Snow, Asst. U. S. Atty., Salt Lake City, Utah (Ramon M. Child, U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

This appeal is from a conviction and 25-year sentence for robbery of a federally insured bank and assaulting and putting in jeopardy the life of a teller by use of a rifle, in violation of 18 U.S.C. § 2113(a) and (d). A former conviction was reversed and the case remanded for a new trial. 10 Cir., 504 F.2d 1203.

The facts about defendant's commission of the 1971 robbery of the bank in Salt Lake City were stipulated, with the defendant's approval. The defense was lack of mental competency at the time of the offense. On this appeal defendant argues these main points: (1) that there was prejudicial error in comments by the trial judge which assumed crimes not at issue and not committed, but which were inferentially connected to defendant; (2) that the lengthy dialogue by the court with the psychiatrist discussing hypothetical crimes and improperly instructing the jury on the law was reversible error; (3) that the court erred in failing to instruct the jurors that they were the sole judges of the facts and were not bound by the court's comments and questions; (4) that denial of use of a form of verdict of not guilty by reason of insanity was error; (5) that the manner of removal, without explanation, of the not guilty by reason of insanity verdict form from the jurors after its submission was reversible error; and (6) that the evidence was insufficient to sustain the conviction.[1]

The stipulation was essentially that on October 6, 1971, defendant entered the bank about 1:45 p. m. and went to teller Nancy

---

1. This proposition was not stated as a heading in the defendant's brief on appeal. However, the insufficiency of the proof to establish competency was argued in defendant's briefs and at argument. (Brief for Appellant, 4–5; Reply Brief of Appellant, 7). Since competency was the sole issue at trial and is a substantial question, we will treat its merits.

Vaughn's cage carrying a 7 mm Mauser rifle and a grocery type paper sack, while wearing a hunting cap and eye glasses. He showed her the gun, handed her the sack and told her to fill it up and to hurry up. She placed $1,734 in the sack and defendant said "That's enough," grabbed the sack and walked through the back door. He drove away in a 1971 Pontiac, belonging to him, carrying the rifle and the sack full of money.

At 5:00 p. m. that same afternoon FBI agents searched defendant's car and there found the hunting cap and glasses worn by defendant, a brown paper sack, and a 7 mm Mauser rifle loaded with four unfired rifle shells in the magazine and an unfired shell in the chamber. The rifle was cocked with the safety on.

At about 6:35 p. m. that day defendant was arrested in Salt Lake City by the agents. At that time he had $1,730 in his possession including money placed in the sack by the teller during the robbery.

It was further stipulated that defendant had been hospitalized for mental illness in the Utah State Hospital at Provo and at the Veteran's Administration Hospital at Salt Lake City during various periods since 1955. Prior to that, defendant was hospitalized in a psychiatric institution in Maryland following service in the Marines in the second World War. Copies of clinical records and reports of the Veteran's Hospital were stipulated to and made part of the record. (Defendant's Ex. A).

After the prosecution presented proof of the offense by offering the stipulation, the defendant introduced the records to establish the defense of incompetency. The medical records offered (Defendant's Ex. A) showed an extensive history of mental problems. Those records and defendant's testimony at trial showed the following background relating to his competency:

Although defendant had a troubled childhood, his first problems related to explosives began in 1938 when, at the age of 17, he was taught how to use explosives after working with a jack hammer successfully for several months in the Civilian Conserva-tion Corps. Although he enjoyed setting off explosives, he received no particular physical satisfaction from it at that time. In 1942, at age 21, he joined the Marines and was sent overseas to participate in the invasion of Guam. At that time he enjoyed the sound of explosives. When asked by several soldiers why he froze up when they were being fired upon, he responded that he felt a chill down his back and a tingling sensation.

Later defendant broke into an ammunitions depot, stole grenades and other ammunition, stole a jeep and went to a remote part of the island where he spent three days, setting off numerous explosions. As a result of this, court martial proceedings were initiated against him but dismissed following his hospitalization in a psychiatric institution in Maryland. While hospitalized he received electric shock treatments seventeen times, returned to duty and received an honorable discharge.

After marriage in Utah he said he sought explosives for sexual excitement. In 1955 he dynamited four cars and, as a result, spent some time in jail before he was transferred to the Utah State Hospital and released a year later. A few months after his release he was found guilty of breaking into a sporting goods store and stealing guns and ammunition. Consequently he was re-hospitalized at the Utah State Hospital where he spent the next seven and one half years. In 1964 he was again released and this time spent eight months outside the hospital. He then began failing to take his medication and again broke into a sporting goods store and was returned to the Utah State Hospital, where he spent twenty-eight months before being transferred to the Veterans Administration Hospital in Salt Lake City in March, 1968, and released there on October 12, 1970.

The Veteran's Hospital records show an examination relating defendant's fear that he would lose control and hit or break something. He spent most of his time ruminating over experiences in the past. The record also shows that when defendant was not taking medication he said he heard

voices which, for example, told him to "run away from the Utah State Hospital" and "kill certain persons." According to him, the voices were less demanding when he was taking medication.

The clinical diagnosis was antisocial personality; mental deficiency, primary, full scale IQ 71 as determined by the Wechsler-Bellevue intelligence scale (70 or below classifying one as a moron). His diagnosis at Provo in the State hospital had been: "Schizophrenic reaction, paranoid type compensated, with strong antisocial tendencies only marginally controlled" and a similar diagnosis was given at his admission to the Salt Lake Veteran's Administration Hospital in 1968. As to judgment, the Veteran's Administration Hospital records stated that in his general activities he "shows moderately good judgment except at times when he becomes antagonistic and seclusive. At this time he acts almost entirely on impulse and not with logical thinking."

At trial, defendant testified that the detonation of explosives gives him some kind of sexual or erotic gratification. At a psychiatric hospital after World War II he received electric and insulin shock treatments. He was given mennaril (sic) but it did no good and he then received stelazine, which seemed to give him relief and control. He has heard highly educated, demanding voices when he failed to take his medication and without medication he can't control his feelings.

Before the robbery he had been without medication for approximately six days and during this time he had been without sleep for three nights and he heard voices commanding him to "rob the bank to get the money to buy some dynamite" or "[t]hey would destroy me." After he left the bank

his car ran out of gas and he abandoned it. (R. Vol. I, 65–68).

Dr. Bliss, Professor and Chairman of the department of Psychiatry at the University of Utah, testified for the prosecution. He examined the defendant on one occasion on February 1, 1972, for approximately one hour and read the Veteran's Administration records. He agreed with the records' diagnosis, concerning defendant, of schizophrenia; a "borderline moron" in view of the I.Q. of 71; preoccupation with explosives; and a strong urge to get money to buy explosives and so derive some sexual gratification. Dr. Bliss said his schizophrenia was "probably actually a disease of the brain, probably a genetic disorder." (R. Vol. I, 13, 15, 21–22, 33).

■ The data from the records clearly dissipated the presumption of sanity and placed on the prosecution the burden of establishing, beyond a reasonable doubt, defendant's competency to commit the offense. *Fitts v. United States,* 284 F.2d 108, 113 (10th Cir.). As noted, the prosecution sought to meet its burden by presenting the expert testimony of Dr. Bliss and that of laymen. It is convenient to detail their proof later in discussing the issues raised on this appeal, to which we now turn.

*First,* defendant argues that comments by the trial judge were an abuse of his discretion and prejudiced the defendant. More specifically he points to the questioning of Dr. Bliss by the trial court during which a hypothetical was put concerning a man from a poverty stricken portion of New York City under compulsion to obtain money for his family needs. Reference was then made to a situation like that of defendant, but including mention of a pistol which was probably stolen; having no permit for the gun; and robbing a bank.[2]

2. The hypothetical question was asked by the court during direct examination of Dr. Bliss (R. Vol. I, 28–30):

THE COURT: It is a common enough problem. Here we are in a depression and you are on the lower East Side of New York City in an area where the Black people live, an area where the Puerto Ricans live, they are out of work, the head of the family is unemployed, he has run out of whatever welfare payments he is entitled to, he has no place to turn for money. He has a wife and kids and a terrible housing situation. His place is cold. There is no running water, cold or hot. It is just a terrible situation. And this is true of a lot of places in this country. And it all gives rise to crime. And that is what I am coming to.

Although the court later gave a curative instruction, the defendant says the prejudice was such that it could not be cured, citing *Horton v. United States*, 115 U.S. App.D.C. 184, 317 F.2d 595 and *United States v. Nazzaro*, 472 F.2d 302 (2d Cir.), *inter alia*. He contends the judge went so far in his questioning and comments that he assumed the role of an adverse witness. *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321.

A federal judge presiding over a jury trial is more than a mere umpire and he may by questioning assist in bringing out the facts of the case. *Jordan v. United States*, 295 F.2d 355, 356 (10th Cir.). Here, however, the trial judge recognized the fact that his questioning left the impression that defendant was involved in the situation relating to the pistol and the judge said a correction must be made (R. Vol. I, p. 44). This he did shortly after the jury returned from the lunch period. The judge emphatically stated that the reference in his question was to a hypothetical situation having nothing to do with this case; that the de-

fendant took no pistol and had no pistol without a permit; and that the remarks were not intended to refer to the defendant and should be wholly disregarded (id. at 46–48). We feel this action by the trial court was sufficient.

*Second,* there is the further and perhaps more serious problem that the court remarked, after stating the hypothetical concerning the ghetto man, that "the law doesn't let a man off from his responsibility to abide by the law because he is driven by some such thing as that." (Id. at 29). The court in the same hypothetical stated that: "I am going to have to tell the jury after awhile what the law is. And, of course, I have made some comments about that already." Defendant argues that these statements implied that he was guilty because his compulsion had been improperly equated with that of the ghetto man, in the hypothetical, and then dismissed as no defense under the law.

We must disagree. While these statements were unfortunate the court gave a specific, emphatic and prompt instruction

Now, this chap gets an idea that he needs some money and it is a pretty good place to get it down at this branch bank. And he takes a pistol, which he doesn't have any permit from the police to take, in the first place, but he has probably stolen that under this compulsion. And he carries this pistol down to the bank, puts something over his face, and he goes in with a bag, a paper bag, a shopping bag, shoves that pistol in the face of some teller there and says, 'Put all your money in here and, if you make any noise about it, I will kill you.'

What is he doing it for? Under other circumstances he wouldn't have done it at all, but there is a compulsion. And I doubt if that compulsion for money that the defendant says he had—he has a compulsion to get some money to buy explosives to give him some kind of an erotic satisfaction.

Here is a man who has a compulsion to go down there and hold up that bank and get some money so he can buy some milk and bread for the babies, so he can get the water turned on in the house. The electricity is off. He needs some fuel.

Now, the law doesn't let a man off from his responsibility to abide by the law because he is driven by some such thing as that. The question is whether he had, when he did that, an intention to do what he was doing or

whether he did not have a free will and choice at that time, that is to say, that the situation was such that he did what he did without his willing it to be done, without intending it to be done.

The law requires a combination, the unity, of the act and intent. And the question in all criminal cases is: Is there intent?

Now, that issue is brought sharply to bear in this case. The defendant has a lawyer who is very ably representing him and who has raised this issue, but now there are three of us involved here: the jury, you Dr. Bliss, and the Court. We are all going to have to do something about this. I am going to have to tell the jury after awhile what the law is. And, of course, I have made some comments about that already.

And you have to tell them what his—really what his mental capacity was at that time. Was there high enough competency so that you can say—you have already said he knew what he was doing. You have already said he knew what he was about, a word that you use sometimes, doctor—I don't think you used it today—Was he oriented as to time and place and the people around. In other words, did he know where he was? Did he know what he was doing? And you answer yes to all of those, I take it.

THE WITNESS: That is correct, sir.

shortly after the lunch break to disregard any connection of the ghetto example and the pistol with the case of the defendant. The court also said that the ghetto example was " . . . a hypothetical situation. It had nothing to do with this case. It was to illustrate another kind of compulsion and tended to throw some light on this one, perhaps." (R. Vol. I, 46). The issue of competency was clearly left to the jury and was properly submitted. We are satisfied that the prompt curative instruction, considered with the final charge to the jury, was adequate. See *United States v. De Angelis*, 490 F.2d 1004, 1009–1010 (2d Cir.), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306.

*Third,* defendant contends that there was error in the failure of the court to charge the jurors that they were the judges of the facts, and were not bound by his questions or comments, citing *United States v. Cisneros*, 491 F.2d 1068, 1073 (5th Cir.).

■■ Where a trial judge exercises his discretion to comment on the evidence, it is essential that the jurors be clearly told that, nevertheless, all matters of facts are submitted to their determination. *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321. A similar instruction is desirable and generally given to impress the jury that the trial court has not expressed a view on the facts by various rulings during conduct of the trial. While such specific statements were not made in the charge, the instructions were clear in submitting the issue of competency for full deliberation by the jurors. (R. Vol. I, 88–91). We feel that the general charge, together with the thorough curative instruction given earlier, removed any real harm to the defendant. (R. Vol. I, 46–48). We are satisfied that the instructions as a whole, considering also the comments and questioning complained of, were adequate and submitted the case without prejudice. *United States v. Beitscher*, 467 F.2d 269, 273 (10th Cir.).

*Fourth,* defendant maintains: that he was entitled to submission of a not guilty by reason of insanity form of verdict, as was requested; that insanity was the only question submitted to the jury; and that such a verdict form provides the jury with the clearer choice, particularly for response to the question that the defendant asked the jury to answer.

In fact, the trial court originally submitted the requested form to the jury.[3] However, while no exception was taken to the instruction, a question about it was raised by the prosecution, which suggested there was no authority to commit defendant unless he was presently incompetent (R. Vol. I, 93–95). Shortly, the trial court called the jury back in; withdrew the not guilty by reason of insanity form and the guilty form originally submitted; stated that "[s]o we don't make that mistake again, I want those put away." (R. Vol. I, 96); and then submitted to the jury a form for finding " . . . the defendant Bert Glenn Munz not guilty of the offense charged in the information," and a guilty form. Defendant says this denial of the not guilty by reason of insanity form was error.

■ We must disagree. The federal courts in this Circuit have no authority to order commitment of one only found not competent at the time of the offense; such commitment is restricted to incompetency occurring at or continuing through the federal criminal process. See *United States v. Borum*, 464 F.2d 896, 900 (10th Cir.); *Powers v. United States*, 305 F.2d 157, 158 (10th Cir.); *United States v. Greene*, 497 F.2d 1068, 1073–76 (7th Cir.), cert. denied, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839. The defendant's suggestion to the contrary based on 24 U.S.C.A. § 211 and *Pollard v. United States*, 285 F.2d 81 (6th Cir.), does not convince us. Thus there is no necessity or requirement for the special verdict form

---

3. When the forms of verdict were discussed by the trial court in the instructions, the court made the following statement in connection with the not guilty by reason of insanity form. (R. Vol. I, 90):

"In the event you find the defendant not guilty by reason of insanity, he will be presumed to be insane and may be confined in a hospital or treatment facility as long as the public safety and his welfare require."

by which a jury may specifically find a defendant incompetent.

It is true that use of the not guilty by reason of insanity form has been held not to be error, standing alone. *United States v. McCracken,* 488 F.2d 406, 420 (5th Cir.). We feel, however, that proper use was made here of the standard "not guilty" and "guilty" forms, which was in accord with the strong policy favoring submission of a general verdict form to preserve the jury's function in a criminal case, unrestricted by any requirement of a special verdict. See id. at 418–19. It is true that reasons for avoiding a special verdict form, such as not requiring a jury to state reasons for its verdict, see id. at 418, were essentially removed here because the stipulation and the proof had already narrowed the case down to the single issue of competency. However, this situation also disposes of the contention that the special verdict form would give a clearer choice. In view of the narrowing of the issues to the one question of competency, and the clear submission of that question to the jury,[4] we cannot see any prejudice from use of the general verdict forms.

*Fifth,* the defendant argues that even if he had no right to use of the not guilty by reason of insanity form, nevertheless, the manner of withdrawal of the form, without any explanation and with the remark that its submission had been a "mistake," amounted to directing a verdict of guilty and was error.

■ It was unfortunate that the withdrawal of the requested form occurred without some neutral explanation. However, as noted, the court was following the general practice on verdict forms in criminal trials and had carefully submitted the competency issue in accordance with *Wion v. United States,* 325 F.2d 420, 430 (10th Cir.), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309. The charge had stat-

ed that "[i]f you have a reasonable doubt of the defendant's mental competency at the time of the offense, then you must find him not guilty." (R. Vol. I, 89). Again after defining reasonable doubt the court instructed the jurors that "[i]f you have such a doubt of the defendant's guilt, you will find the defendant not guilty." (Id. at 91). These statements, thus, did fit in with the general not guilty and guilty verdict forms which the court shortly substituted.

In sum, we hold that there was no prejudice and no error in the handling of the verdict forms by the trial court.

*Lastly,* defendant argues that the prosecution's proof on the competency issue was insufficient. In particular it is urged that Dr. Bliss, the psychiatric witness for the prosecution, was unable to form an opinion as to whether the defendant had the capacity to control his conduct in the face of the compulsion to obtain and set off explosives. (Brief of Appellant, 4–5; Reply Brief of Appellant, 7).

■ Our question is whether there was sufficient evidence establishing that "at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was wrong, and was mentally capable of controlling his conduct." *Wion,* supra, 325 F.2d at 430. If at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the law, he is not criminally responsible for his conduct. Ibid.

■ The test we must apply in judging the sufficiency of the evidence on the competency issue is clear. Where a guilty verdict has been returned and is attacked on appeal, we are bound to view the evidence in the light most favorable to the prevailing party to ascertain if there is sufficient substantial proof, direct and circumstantial, to-

---

4. The court gave a clearly proper instruction on the test of competency and what the jury must be convinced of beyond a reasonable doubt to return a guilty verdict. In accordance with our earlier remand, the instruction meticulously applied the test laid down in *Wion v. United States,* 325 F.2d 420, 430 (10th Cir.), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309, and was the instruction prepared by defense counsel.

gether with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt. *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.). So viewing the evidence in this case, the proof favorable to the verdict tended to show the following:

▮▮▮ The stipulation on the commission of the robbery was offered. The medical records comprising Defendant's Exhibit A were then introduced, dissipating the presumption of sanity. Dr. Bliss then testified concerning his February 1, 1972, examination of defendant of approximately one hour. He said that he felt the defendant was mentally capable of knowing what he was doing at the time of the offense in 1971 and that he had the capacity to know whether or not what he was doing was wrong. (R. Vol. I, 7). On the crucial question whether the defendant had substantial capacity to conform his conduct to the requirements of the law, or to control his conduct, the doctor stated (ibid):

Q (By Mr. Snow) Do you have an opinion whether the defendant was capable of controlling his conduct on the date in question?

A That is a very difficult question, and I would have to say that there were forces at work in this situation which reduced his control. I don't want to make it difficult, but you are really now asking me a quantitative question. All I can say is that he has less control than most people.

Later Dr. Bliss stated (id. at 15–16):

Q (By Mr. Snow) Would you state for us your opinion as to whether or not the defendant had the ability to control his conduct.

A I think we are back where I was before. Yes, I think he has [5] the capability of controlling his conduct, but it is less than that which most people have. It is a quantitative thing. It is not a qualitative

thing. People vary enormously depending upon the situation, in their ability to control their behavior. Some people have great control.

What you are really asking me to do is evaluate how much control he had at that time. That is very difficult.

While the court was questioning Dr. Bliss, the problem was discussed again (R. Vol. I, 25–26):

THE COURT: Do you think he did make up his mind to do it and was in the exercise of free will and choice, or do you think that he was driven, that he was under some compulsion so strong that he had no choice in the matter.

THE WITNESS: I apologize for being evasive.

THE COURT: You are not being evasive.

THE WITNESS: But I think I would have to answer it this way, and this is my opinion, this is the way I had reconstructed it, given what information I have: Here is a man with a low I.Q. Here is a man who, by history, has been schizophrenic for many years, with fluctuations up and down. Here is a man who should have been on his medicines and was off the medicines, for which he was responsible, but nevertheless he was off the medicine. Here is a man who has a compulsive urge to detonate explosives because there is satisfaction involved. That is the situation.

He then says he wanted money so he could get the explosives. His judgment was somewhat impaired, but it certainly was not impaired so he didn't know what was right or wrong and didn't know what he was doing.

Under those circumstances would you say he was driven beyond control to perform this act? And I can't answer it. I think it is a moot question.

---

**5.** At this point and later (see n. 6, infra) Dr. Bliss responded in the present tense to the question regarding capacity of control, which is not correct—capacity of control at the time of the offense being the proper test. However, in the context of all the testimony and questioning, we do not feel that this defect constitutes any serious deficiency in his testimony regarding competency.

THE COURT: Well, it isn't moot. It is the question in this lawsuit, and those twelve ladies and gentlemen of the jury are going to have to answer precisely that question.

THE WITNESS: Right.

The discussion between the court and Dr. Bliss continued (id. at 31):

THE WITNESS: As I understand the question the Court faces, it is: Does he have control over his behavior? Is that correct?

THE COURT: Well, you can put it that way if you want to. Of course, a fellow may intend to do something and have a physical capacity and not have control over his behavior. What I am talking about is so far as his brain power is concerned, did he have control over his behavior?

THE WITNESS: My answer to that would be yes, he does,[6] according to his intellect or his brain power, although, if I were going to be absolutely precise about it, I would say that his control even over his brain power is somewhat less—although within normal limits—than most people. In other words, having a low I.Q. and being chronically schizophrenic is going to do something to his brain power.

In addition to this expert testimony there was lay proof giving some support to the prosecution. The teller testified that when defendant spoke to her in the bank he seemed calm and spoke in a normal to fairly soft tone and did not seem more nervous than she was in the situation (which was not described). (R. Vol. I, 55). His foreman at the office equipment warehouse said that on October 4th defendant had asked for a day off. Then on the day before the robbery he performed his duties very well, the same as always. The foreman stated, however, that defendant would not retain the knowledge from one day to the next where items he was sent for were located. (id. at 50–51). Payroll records showed that defendant worked the full final two-week pay period in September, 1971, just before the October 6 robbery.

There was, in the psychiatric and lay testimony, other proof favoring the defendant's position that he was incompetent, but we are not to weigh the evidence. The adequacy of the proof tending to support the verdict is what we must basically consider, since the record at this point on appeal must be viewed in the light most favorable to the prosecution.

The competency issue is indeed worrisome, as was recognized by Dr. Bliss, who testified for the prosecution. The diagnosis and history from other experts are disturbing and included the observation from the psychiatrist in 1968 at the V. A. Hospital that because of his dullness of expression and low mental capacity, it was suggested that defendant may have organic brain damage (Defendant's Exhibit A). At several points in his testimony Dr. Bliss did show inability to state that the defendant had the capacity to control his conduct. However, viewing all his testimony and the whole record in the way we must, we are convinced that the evidence is sufficient to sustain the conviction. Having arrived at this conclusion and finding no reversible error, the judgment is

AFFIRMED.

**6.** See note 5, supra.