**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Darrel E. SHELTON,**
**Defendant-Appellant.**

No. 77–1575.

United States Court of Appeals,
Ninth Circuit.

Oct. 27, 1978.

Thomas R. Sheridan (argued), of Simon & Sheridan, Los Angeles, Cal., for defendant-appellant.

Ernest J. Brown, Asst. U. S. Atty. (argued), M. Carr Ferguson, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DUNIWAY, Senior Circuit Judge, ELY, Circuit Judge, and EAST, Senior District Judge.*

EAST, District Judge:

## THE APPEAL

Darrel E. Shelton (Shelton) appeals his judgment of conviction and suspended sentence entered upon a jury verdict of guilty on one count of violating 26 U.S.C. § 7206(1) (willfully filing a false income tax return.[1] We note jurisdiction under 28 U.S.C. § 1291 and affirm.

## ISSUES ON APPEAL

Shelton urges these issues for review:

1. The evidence was insufficient to support the jury's verdict;

2. Various forms of Government misconduct deprived him of a fair trial;

3. The District Court erred in refusing to submit Shelton's requested special verdict form; and

4. The District Court improperly instructed the jury.

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. 26 U.S.C. § 7206 provides in pertinent part: "Any person who—

"(1) . . . Willfully makes and subscribes any return, . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . .

"shall be guilty of a felony . . .."

1244

## FACTS

Shelton was charged with under reporting his income for the year 1972. At that time, he was the Business Manager for Iron Workers Union, Shopmen's Local 509. The essence of the Government's case was that Shelton received and failed to report as income payments in property and cash from Joseph Hauser in return for getting the Union to shift its prepaid health insurance plan from Aetna to National Prepaid Health Plan (NPHP), one of several companies run by Hauser.

While the Government elected to proceed on the omission of specific items theory, rather than the net worth expenditure theory, the indictment did not spell out the amount of unreported income and the defendant was not initially made aware of the allegedly unreported items. However, the District Court denied Shelton's pretrial motion for a bill of particulars after the Government stated that the amount of unreported income charged was approximately $8,000. The District Court further ordered that the Government would be precluded from proving amounts in excess of the $8,000. Nevertheless, in its opening statement, the Government mentioned and tendered exhibits for items exceeding the $8,000 limit. On objection, the Government repeated its intention to offer evidence as to items exceeding the $8,000 limit. After colloquy, the Court reaffirmed the limit and required the Government to choose from its

pretrial memorandum which items it would attempt to prove.[2] The excessive exhibits were then withdrawn and the District Court immediately instructed the jury on which alleged items of income it would consider. During the course of the trial, Shelton admitted receiving four of the six items but contended they were not reportable as income because they were gifts from his long-time friend Hauser. He denied receiving the $5,000 cash payment or the clothing.

The Government's key witness, Ronald Prohaska, the Union's former Business Agent working under and with Shelton, testified that the Union's health insurance plan was up for renegotiation in 1972 and in late 1971 Shelton told him that Hauser would pay them a large amount if they could swing the Union's health insurance business to Hauser's company. He further testified that he and Shelton successfully accomplished the shift to NPHP in May or June of 1972. Prohaska also testified that he, Shelton and Hauser were present at a Mr. Big's clothing store when Hauser paid for several hundred dollars worth of clothing for the two of them. He also stated that he and Shelton each received a $5,000 cash payment from Hauser in June, 1972.[3]

Prohaska also testified that in May, 1973, after the Government began its investigation of their activities, he, Shelton, Hauser and Sidney Krems attended a meeting in which they discussed which of Hauser's payments to them could "haunt" them.

2. The Government finally settled on the following items:

| Item | Date of Transfer | Amount |
|---|---|---|
| 1. Refrigerator | 1/20/72 | $ 872.55 |
| 2. Hotel bill | 2/ 9/72 | 134.26 |
| 3. Clothing | 2/10/72 | 422.00 |
| 4. Cash | 1972 | 5,000.00 |
| 5. Television set | 3/ 6/72 | 314.95 |
| 6. Hotel bill | 11/14/72 | 476.43 |
| | TOTAL . . . | $7,220.19 |

3. No other witness testified that Shelton was present at Mr. Big's or that he had received the clothes. Shelton and Hauser denied their presence and that Shelton received any of the clothes. George Herrera, a Hauser employee, testified that he, not Hauser, was present to

authorize the purchase, that Shelton was not present, and that Prohaska was the only recipient of clothing. However, while the sales receipt did not bear Shelton's name, it did indicate the sizes of the garments. From other testimony, the jury could have concluded that some of the clothing would have fit Shelton. Prohaska did not actually see Hauser give Shelton the $5,000. He testified that Hauser gave him his share and stated that he would pay Shelton in Las Vegas the following day. Prohaska testified that he, Shelton, Hauser, Priscilla Rowe, and others were in Las Vegas that June and that Hauser lost Shelton's $5,000 while gambling. Priscilla Rowe testified that she heard Shelton comment that Hauser was losing "his five." Finally, Prohaska testified that after their return from Las Vegas, Shelton said he had finally received the $5,000 from Hauser.

Defense counsel vigorously cross-examined Prohaska. First, Prohaska admitted that he had been given immunity for the very same acts for which Shelton was being tried; second, he admitted receiving more than $3,000 in witness or informant's fees from the Government—approximately $2,400 of this amount was related to his testimony in the instant case; and third, Prohaska admitted that he had perjured himself before the grand jury on at least two occasions with respect to the overall investigation which encompassed Shelton's case. Prohaska's testimony that he bore no animosity toward and made no threats against Shelton because Shelton fired him from his union job was directly contradicted by the testimony of two defense impeachment witnesses.

Finally, the core of Prohaska's testimony was directly contradicted by Shelton, Hauser, and Herrera.

## DISCUSSION

*Issue 1, Sufficiency of the Evidence.*

■ The only disputed elements in this case were whether Shelton's return was materially false (*i. e.*, whether he had even received the unreported items or, if so, whether they were gifts and hence not reportable)[4] and whether he acted willfully in failing to report them (*i. e.*, whether he reasonably believed the items were gifts).

Shelton claims that the evidence was insufficient because "Prohaska was so thoroughly impeached that as a matter of law his testimony should not be considered or in the alternative, that even with his testimony the evidence is still insufficient . . .."

"On appeal from a criminal conviction, this court must construe the evidence direct and circumstantial in a manner consistent with the jury's verdict, resolving all conflicts in the evidence in favor of the prosecution. . . . We cannot weigh conflicting evidence, nor consider the credibility of witnesses." *United States v. Rodri-*

guez, 546 F.2d 302, 306 (9th Cir. 1976). Citations omitted. In *United States v. Rojas*, 554 F.2d 938 (9th Cir. 1977), this Court reversed a decision in which the District Court, accepting an argument identical to that made here, granted the defendant's motion for a judgment of acquittal following the return of a guilty verdict by the jury. In reversing, this Court reiterated that " 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.' " *Id.* at 943, quoting *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969).

The uncorroborated testimony of an accomplice, although suspect, can support a conviction. *United States v. Hibler*, 463 F.2d 455, 458 (9th Cir. 1972). This is "the rule even though the accomplice is in a position to gain favors from the government by his testimony . . . and even though there are inconsistencies in his story . . . so long as it is not 'incredible or unsubstantial on its face.' " *Lyda v. United States*, 321 F.2d 788, 794–95 (9th Cir. 1963). (Citations omitted). Before an appellate court may disregard a witness' testimony, it must be "inherently implausible." *Rojas*, 554 F.2d at 943. *Accord, United States v. Cravero*, 530 F.2d 666 (5th Cir. 1976). We cannot say that Prohaska's testimony was inherently implausible.

Accordingly we believe the evidence, viewed in the light most favorable to the Government, is sufficient to support the jury's verdict.

*Issue 2, Alleged Government Misconduct.*

Shelton's next argument is that the combined effect of various forms of Government misconduct deprived him of a fair trial. The conduct complained of by Shelton covers three categories: First, he argues that the Government illegally paid Prohaska informant fees under the guise of a federal statute providing only for the

---

4. Property acquired by gift within the meaning of the Internal Revenue Code is, of course, not gross income and need not be reported. *E. g.,* *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

payment of witness fees under conditions not here met. Second, Shelton claims he was prejudiced when the Government violated the District Court's order limiting proof when it submitted and the jury viewed exhibits detailing allegedly unreported items exceeding the District Court's $8,000 limitation. And third, Shelton contends that he was prejudiced by the Government's delay with respect to some evidence and failure with respect to other evidence to turn over exculpatory evidence as required under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and to a lesser extent the Jencks Act, 18 U.S.C. § 3500. These complaints are considered seriatim.

██ During the preparation of this case for trial, the Government paid Prohaska substantial sums of money ostensibly as witness fees pursuant to 28 U.S.C. § 1821. This statute provides for the payment of $20 per day plus travel expenses to "[a] witness attending in any court of the United States, or before a United States commissioner [magistrate], or before any person authorized to take his deposition . . ." Shelton argues that under the facts here, these payments were made in violation of § 1821 and constituted disguised informant fees which misled the jury about Prohaska's credibility. On this basis, Shelton invites us to use this Court's supervisory power to strike Prohaska's testimony.

Assuming, *arguendo*, that the payments violated the witness fee statute, it would not justify the remedy sought. The use of the Court's supervisory power is properly limited to those situations in which the Government's misconduct, though falling short of a constitutional violation, threatens " 'the integrity of the judicial process' . . .." *United States v. Chanen*, 549

F.2d 1306, 1309 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (U.S. 1977). (Citation omitted). *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974) (Hufstedler, J., concurring specially).

The issue of payments to Prohaska was fully aired to the jury.[5] Moreover, the District Court cautioned the jury about carefully weighing the credibility of "an informer who provides evidence against a defendant for pay . . .."

Informant fees are neither unlawful nor unduly prejudicial per se. And there is no contention here that the payments were based on the type of contingent fee arrangement condemned by the Fifth Circuit in *Williamson v. United States*, 311 F.2d 441, 444 (5th Cir. 1962). See Annot., 13 ALR Fed. 905 (1972). In essence, Shelton's argument boils down to the claim that Prohaska's testimony should be stricken because the Government paid for it out of an improper source of funds. While we could neither endorse nor condone such action, we feel that to resort to the exercise of the Court's supervisory power on these facts would be an improper use of the power merely to foreclose law enforcement practices which we do not approve. *See Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

██ Shelton complains that he was prejudiced because at the outset of the trial the Government submitted and the jury viewed exhibits related to items of allegedly unreported income in excess of the aggregate $8,000 limitation previously imposed by the District Court. Although there is no excuse for the Government's disregard of the order limiting proof, this claim is unavailing.

---

5. During the cross-examination of Prohaska, it was brought out at length that he had received more than $2,400 from the Government in exchange for his cooperation in the Shelton case. During the cross-examination of another Government witness, it became apparent that even more money had been paid to Prohaska in connection with another investigation. The District Court allowed Shelton to recall Prohaska for further cross-examination and the nature

of the additional payments—about $550—was also fully explored. It should be noted that while the Government did not initially inform defense counsel of the additional payments, the District Court was fully satisfied with the Government's explanation and found the failure to be inadvertent. In any event, before it retired the jury was fully informed as to the total amount afforded Prohaska in exchange for his cooperation.

Given the assumption that juries ordinarily follow a court's instructions, *United States v. Fassler*, 434 F.2d 161, 163 (9th Cir. 1970), *cert. denied*, 401 U.S. 1011, 91 S.Ct. 1263, 28 L.Ed.2d 548 (1971), error in the admission of evidence can generally be "cured by withdrawing the evidence from the jury's consideration and instructing the jury to disregard it." *Maestas v. United States*, 341 F.2d 493, 496 (10th Cir. 1965). *United States v. Jiminez-Badilla*, 434 F.2d 170, 174 (9th Cir. 1970). This course was taken by the District Court here preventing any prejudice to Shelton.[6]

 Shelton next complains that his conviction should be reversed because the Government violated *Brady v. Maryland* in that it delayed turning over 500 pages of alleged *Brady* material until the eve of the trial and in that it failed to turn over another 1,900 pages of alleged *Brady* material until after trial.[7] In *Brady*, the Supreme Court held that it is a denial of due process for the prosecutor to fail to disclose evidence in his possession which is material to the defense. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court explained that the standard of materiality varies in these situations "depending on the nature of the information withheld and the type of request made by the defendant for the production of the material." *Skinner v. Cardwell*, 564 F.2d 1381, 1384 (9th Cir. 1977). *See also United States v. Brown*, 562 F.2d 1144, 1150 (9th Cir. 1977).

Shelton claims that much of the 500 pages of information turned over to the defense the day before trial impeached Prohaska's credibility. Assuming that all of this information was material within the meaning of *Brady*, the delay in disclosing it only requires reversal if "the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir.), *cert. denied*, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379 (1976). There can be no claim of prejudice insofar as the defendant was enabled to present to the jury favorable or impeaching evidence. *United States v. Bracy*, 566 F.2d 649 (9th Cir. 1977). *Accord, United States v. Kaplan*, 554 F.2d 577, 580 (3d Cir. 1977); *United States v. Decker*, 543 F.2d 1102, 1105 (5th Cir. 1976), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977).

Unlike in *Miller*, the evidence here was received on the day before trial, not near the end of the defense case. And, although unlike in *Miller*, no continuance was offered, there was a five day delay after the second day of trial. Finally, much of the evidence turned over consisted of the grand jury testimony of Hauser and Herrera, both of whom testified for the defense. Thus, Shelton has failed to demonstrate how the Government's delay in disclosing the 500 pages of information prejudiced the preparation of his case.[8]

The contention with respect to the Government's failure to disclose alleged *Brady* material until after trial is divided. The first attack relates to about 1,900 pages of information turned over to the defense during preparation for prosecution of a companion case in which Hauser and Shelton comprised two of the three defendants. This material was disclosed in time for the

---

**6.** We note that the offending exhibits were only briefly before the jury at the outset of the trial and there was no development of the withdrawn evidence by Government. Although there were two subsequent references to one of the stricken exhibits, they were of little import when viewed in the context of the entire trial. In any event, defense counsel did not object to those references.

**7.** The charges here were an offshoot of a widespread, if not national, federal investigation of alleged corruption and crime, thus explaining the huge mass of so-called *Brady* material called for by the defense in this rather simple case.

**8.** The contention with respect to material turned over before the end of the trial includes some Jencks Act material consisting of the transcript of Prohaska's testimony from one of his four grand jury appearances. However, as this evidence was disclosed during his cross-examination, there was no violation of the Jencks Act.

District Court to consider it in passing on Shelton's motion for a new trial in this case. The second attack focuses on a statement given to the Internal Revenue Service on March 7, 1974 by Sidney Krems, Hauser's accountant, which statement was disclosed during the briefing of this appeal.[9]

With respect to the 1,900 pages of information, the *Brady* request can only be classified as general.[10] "The standard of materiality in such cases is whether the 'omitted evidence creates a reasonable doubt that did not otherwise exist.'" *United States v. Brown*, 562 F.2d at 1150, quoting *United States v. Agurs*, 427 U.S. at 112, 96 S.Ct. 2402. The District Court rejected Shelton's motion for a new trial after reviewing the omitted evidence, finding that it was cumulative or, to the extent it was not, it was remote and collateral in the extreme. We agree. Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral. *United States v. Brown*, 562 F.2d at 1150–51. *See also United States v. Mackey*, 571 F.2d 376, 389 (7th Cir. 1978).[11]

▪ Shelton also claims that the Government's failure to disclose a statement made by Sidney Krems necessitates a new trial under the teachings of *Brady*. As was mentioned earlier, Prohaska testified on direct examination that Krems was among those who attended a meeting in 1973, the purpose of which was to cover-up Hauser's payments to Shelton and Prohaska. Shelton and Hauser denied the meeting took place but Krems did not testify.

During its cross-examination of Prohaska, the defense made a *Brady* request for "[i]nterview reports of a bookkeeper named Sidney Krems." Counsel for the Government stated that he believed Krems had been interviewed by the Internal Revenue Service and the District Court ordered disclosure of the report. However, the Government was unable to locate the report until well after the trial. The memorandum of the Krems interview, which was made a part of the record for this appeal, states that Krems was reminded of allegations that he was involved "in attempts to cover up illegal payments to other individuals," that he was the subject of a related IRS investigation and that the Special Agent wished to ask him questions "[i]n connection with my investigation of the tax liability of JOSEPH HAUSER and others . . . .." Insofar as it is relevant to Shelton's *Brady* request, the memorandum indicates: "KREMS insisted that he was innocent of any wrongdoing. He stated 'I know of no payoffs that JOE made to anyone,' and 'I am not aware of any payoffs or cover-ups.'"

We are satisfied that Shelton's request for Krems' statement was "specific"—that is, by "focus[ing] his request on a particular witness," the defense gave "'the prosecutor notice of exactly what the defense desired.'" *United States v. Mackey*, 571 F.2d

---

9. The Government's motion to include the text of this statement in the record before this Court was granted on November 30, 1977 and the statement may, therefore, be properly considered in disposing of this appeal.

10. Although there was much discussion between counsel and the District Court over the nature of *Brady* material, the Government had little guidance other than that it was to disclose everything which tended to impeach Prohaska's credibility. Such a request is general since it "did not give 'the prosecutor notice of exactly what the defense desired.'" *United States v. Lasky*, 548 F.2d 835, 839 (9th Cir. 1977), *cert.*

denied, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (U.S.1977).

11. Shelton complains that the Government's failure to turn over material was deliberate. First, we note that the District Court expressly rejected this argument with respect to the 1,900 plus pages of evidence. Second, it is now clear that the prosecution's motive in failing to turn over alleged *Brady* evidence is irrelevant in determining its materiality. *Agurs*, 427 U.S. at 110, 96 S.Ct. 2392; *Skinner v. Cardwell*, 564 F.2d 1381, 1385 (9th Cir. 1977); *Brown*, 562 F.2d at 1149.

at 389.[12] In such situations, if "a substantial basis for claiming materiality exists . . . the failure [of the prosecutor] to make any response is seldom, if ever, excusable." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399.

Clearly, a substantial basis exists for claiming that the Krems' statement was material in a *Brady* sense. The Government relied heavily on Prohaska's testimony about a cover-up meeting to prove that Shelton consciously attempted to conceal payments that he knew were income. Krems' statement can be construed as contradicting that testimony. It is true, however, that Krems' denials were cumulative given the similar denials by Shelton and Hauser. Thus, in view of the substantial impeachment of Prohaska from other evidence, the addition of Krems' testimony would not have created a reasonable doubt that did not otherwise exist. However, Krems was a much more marginal figure than either Shelton or Hauser, and his testimony may have been given greater credibility by the jury. Accordingly, nondisclosure in the face of a specific request would be inconsistent with *Brady's* "concern that the suppressed evidence might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398.

Nevertheless, we feel that a rejection of Shelton's *Brady* claim is still required here. In reaching this conclusion, we keep in mind that the primary concern expressed in the *Brady* line of cases is that the accused not be deprived of a fair trial. *Agurs; United States v. Bracy.*

This is not a case where, when faced with a specific *Brady* request, the Government failed to make any response.

The Government initially resisted Shelton's request for Krems' statement on the ground that "Mr. Krems is equally available to the defendant. He is not unknown in any sense." Although this was not disputed by Shelton's defense counsel, the District Court reasonably ordered production of the statement.[13] During ensuing colloquy, the Government's counsel indicated that he thought he had only Krems' grand jury testimony and that it would be supplied. The District Court indicated Krems' last known address should also be made available, and Shelton's counsel stated that would be satisfactory.

Notwithstanding this colloquy, the parties understood that the Government's efforts to locate the Krems' statement were to continue. After Prohaska's testimony but before the close of the Government's case, the subject was raised in open court again. Counsel for the Government stated that the transcript of one Krems interview had been located and disclosed and that another apparently existed which he did not then have. Upon questioning by the District Court, the Government further stated that Krems' address had been supplied to the defense. Thus, the question of Krems' availability to the defense was again raised. Defense counsel made no protestation that he did not know Krems' address or that he had been unable to locate him. In fact, he stated that he had not even attempted to subpoena Krems. Two days later the Government reported in open court that the

---

12. It is true that in *Agurs,* the Supreme Court said that a specific request "is characterized by a *pretrial* request for specific evidence." 427 U.S. at 104, 96 S.Ct. at 2398. (Emphasis added.) Here, Shelton's requests for *Brady* material did not specifically focus on Krems until during the trial. However, Krems' statement was singled out before the prosecution completed its case in chief, and the Government does not argue that it could have uncovered the Krems' statement before the conclusion of the trial had it only been singled out before trial. Finally, Shelton could not reasonably have been expected to single out Krems in his pretrial requests since the defense first became

aware that Prohaska claimed the occurrence of a cover-up meeting involving Krems during his (Prohaska's) direct examination. On these facts, we feel Shelton's request is properly characterized as specific even though it was not made before the trial.

13. After all, the Government could hardly be hurt by disclosing that which the defense could easily obtain. Further, the Government made no argument that the effort necessary to make disclosure was unduly burdensome in view of the defendant's independent access to the information.

search for the Krems' statement had been fruitless so far and that the search was continuing. Although defense counsel was present, he still gave no indication that he had had difficulty locating Krems on his own or that he had tried to do so. The Krems IRS statement was eventually turned up after the conclusion of the subsequent Shelton and Hauser trials during a search of other files. It was immediately made available to the defense and this Court. The circumstances of its discovery were detailed in an affidavit submitted with the Government's motion to augment the record on this appeal with Krems' statement. We have reviewed the affidavit and are still satisfied that the Government made a good faith effort to locate the statement earlier.

It has also been held that the due diligence standard on the part of a defendant in connection with a motion for a new trial should be dispensed with when the new evidence raises constitutional issues. *Marshall v. United States*, 141 U.S.App.D.C. 1, 436 F.2d 155 (1970). This position draws some support in the *Brady* context from the Supreme Court's decision in *Agurs*. There the Court held that even where the accused made no request for *Brady* material, he would not be required to meet a test as stringent as that normally applied in determining motions for new trials. 427 U.S. 110–11, 96 S.Ct. 2400–2401. We feel that in this *Brady* situation some defense diligence was required.[14] Basically, we find ourselves in agreement with the following comment in Seventh Circuit's comments in *United States v. Hedgeman*, 564 F.2d 763, 768 (7th Cir. 1977):

"While we do not necessarily disagree with the D. C. Circuit's statement [in *Marshall*] as a general principle, we do not think in application that it should be carried to the extreme that we find ourselves as arbiters in a case exemplifying

*Brady's* 'sporting theory of justice.' We are of the opinion that at the very least the evidence must be newly discovered, and in this respect it appears to us that failure to exercise diligence can be so obviously bordering on gamesmanship as to place the evidence constructively in the category of non-newly discovered."

Reversal on the facts of this case would amount to permitting the gamesmanship just condemned. First, Shelton knew exactly what benefit he hoped to secure from Krems' testimony and, therefore, had an incentive to seek him out. Second, the record supports the conclusion that Krems was available to the defense. It is not disputed that Krems was Hauser's accountant or bookkeeper and Hauser knew where to contact him. Hauser cooperated fully with and testified at length for the defense—this included his denial of the cover-up meeting. The colloquy in open court between counsel over the whereabouts of the Krems' statement has already been detailed above. Suffice it to say, that given the nature of that colloquy, there was an obligation on the part of the defense to speak up if difficulty was being encountered in locating Krems. Nothing was forthcoming. Under these circumstances, it is unreasonable to ask us to believe that the defense could not have contacted Krems.

We hold that the combination of the nature of the Government's response to Shelton's specific *Brady* request for the Krems' statement and the lack of diligence on the part of the defense in attempting to obtain Krems' evidence independently establish that this nondisclosure did not deprive Shelton of a fair trial.

### Issue 3, Special Verdict.

■ The District Court rejected Shelton's request that a special verdict be submitted to the jury calling upon them to decide which of the six items, if any, constituted

---

**14.** This Circuit has indicated in other contexts that some diligence is still required in *Brady* situations. In *Wallace v. Hocker*, 441 F.2d 219 (9th Cir. 1971), it was held that the prosecution was not required to produce exculpatory evidence about which the defendant knew in the absence of a request. And in *United States v. Brown*, we stated that a general *Brady* request was not sufficient to require disclosure when the defense "negligently failed to discover and utilize information in their own possession." 562 F.2d at 1151.

income to Shelton. He argues the special verdict was required on the ground that without it he was was prevented from arguing following a guilty verdict, either to the District Court or this Court, that he was convicted solely with respect to an item which was insubstantial as a matter of law.[15] We disagree.

It has long been established that special verdicts in criminal jury trials are disfavored, *United States v. O'Looney,* 544 F.2d 385, 392 (9th Cir.), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976); 2 Wright & Miller, Federal Practice & Procedure, § 512 (1969). And while this Court has held that the District Court may submit a special verdict in appropriate cases, *O'Looney,* 544 F.2d at 391–92, Shelton has cited no case and we have found none in which it was held that the refusal to grant a special verdict was error. In fact, this Court has previously upheld the refusal to grant a defendant's request for a special verdict in another single count multi-item case. *Bisno v. United States,* 299 F.2d 711 (9th Cir. 1961), *cert. denied,* 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962). *Cf. United States v. Munz,* 542 F.2d 1382 (10th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 555 (1977); *United States v. Jackson,* 542 F.2d 403 (7th Cir. 1976).

Finally, it is not at all clear that the absence of the special verdict prevented Shelton from making any substantiality argument. The District Court instructed the jury that, with the exception of the smaller hotel bill, any of the six items, standing alone, could be the basis of a conviction if they found it to be substantial.

15. Shelton also argues that the special verdict would have cured the prejudice due to allowing the jury to view the improper exhibits. However, we have already held that there was no such prejudice in view of the District Court's prompt action in withdrawing the exhibits and carefully instructing the jury to disregard them. The Government is not required to prove a tax deficiency to sustain a charge of violating § 7206(1). *United States v. Miller,* 545 F.2d 1204, 1211 n.8 (9th Cir. 1976); *Schepps v. United States,* 395 F.2d 749 (5th Cir.), *cert. denied,*

*Issue 4, Jury Instructions.*

Shelton makes two claims with respect to the jury instructions. First, he argues that the Court incorrectly set out the definition of gift. Second, Shelton contends that the instruction on willfulness was erroneous in that it was incomplete. Neither contention has merit.

█ The trial court instructed the jury that gross income does not include the value of property acquired by gift and that whether an item is a gift depends on the *transferor's* intent. This was a correct statement of the law. *Commissioner of Internal Revenue v. Duberstein,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Shelton's argument that this allows a person to be convicted of a criminal offense based upon another's state of mind is unpersuasive since the element of willfulness prevents a conviction based solely on the state of mind of one other than the defendant.

█ The District Court instructed that "the term 'wilfully' means deliberately and with knowledge, as distinguished from careless, inadvertent or negligent. That is to say, the defendant knew and specifically intended the return to be false when he made, subscribed and filed it." During the conference on jury instructions, the District Court recognized that if Shelton reasonably believed that the items received were gifts, he would not have acted willfully in failing to report them on his return. However, the District Court rejected defense counsel's request to add such a statement to the willfulness instruction on the ground that it was "too specific." Rather, it was left to the defense "to make that argument within the instruction of 'wilfulness' which I am going to give."

393 U.S. 925, 89 S.Ct. 256, 21 L.Ed.2d 261 (1968). *See United States v. Fritz,* 481 F.2d 644, 645 (9th Cir. 1973). The willful omission of gross income is sufficient. *E. g., United States v. Mirelez,* 496 F.2d 915, 917 (5th Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974). However, the Government correctly concedes that the omission must be substantial. *See United States v. Jernigan,* 411 F.2d 471, 473 (5th Cir.), *cert. denied,* 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 225 (1969); *Siravo v. United States,* 377 F.2d 469 (1st Cir. 1967).

It is true that the Supreme Court approved the essence of what was sought here in *United States v. Pomponio,* 429 U.S. 10, 13 n.4, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976). However, while the better practice may be to give such instructions when requested, we hold it was not an abuse of discretion to refuse it here. The defendant has no right to any particular language in the instructions. It is sufficient if the instructions taken as a whole encompass the instruction sought. *United States v. Kaplan,* 554 F.2d 958, 968 (9th Cir. 1977). "Instructions are not a substitute for argument to the jury. If the judge fairly instructs the jury as to applicable principles of law so as to allow counsel on each side sufficient latitude to argue what he considers to be key points in his case, the trial judge has performed his duty." *United States v. Campanale,* 518 F.2d 352, 362 (9th Cir. 1975). This much was done here. We conclude that the instructions as a whole were fair.

The District Court's judgment of conviction and suspended sentence entered on February 11, 1977 is affirmed.

AFFIRMED.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The record quite clearly reveals that repeated requests for possibly exculpatory evidence were essentially and inexcusably disregarded by the Government prosecutors to whom the requests were properly directed. Not until the eve of trial did the prosecution suddenly produce more than 500 pages of material that, as I see it, should have been delivered to the defense long before. Moreover, the prosecution followed the same unsavory pattern during the trial and thereafter, not delivering additional material until there had been continued requests by the defense and, also, prodding by the trial judge. In these circumstances, and in the light of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the judgment of conviction should be reversed.

The Government's case rested heavily upon the testimony of one Prohaska, a for-mer employee of the Union. Without his testimony, the evidence would have been insufficient to support Shelton's conviction. The voluminous material withheld by the Government, especially the records containing the denials by Shelton's accountant of a coverup meeting, impeached Prohaska and Prohaska's incriminating testimony. My Brothers hold that because these materials were merely cumulative, consisting largely of testimony duplicated by two witnesses for the defense, Shelton was not harmed by the late disclosure. I simply cannot agree.

It is true, of course, that our Circuit's rule, a rule that I dislike (*See, United States v. Andrews,* 455 F.2d 632, 633, n.1 (9th Cir. 1972)), is that the uncorroborated testimony of an accomplice, standing alone, will support a conviction. *United States v. Sigal,* 572 F.2d 1320, 1324 (9th Cir. 1978); *Moody v. United States,* 376 F.2d 525, 528 (9th Cir. 1967). Nevertheless, an enhanced impeachment by the accused, armed with material amassed by the Government during its investigation, could have well been pivotal as the jury weighed the evidence relating to Shelton's guilt or innocence. Thus, I submit that it cannot be said that the *Brady* error was harmless beyond a reasonable doubt. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

I take no pleasure in reprimanding government prosecutors or any other attorneys, and I emphasize that, most assuredly, there is no indication here that exculpatory material was intentionally suppressed. What is all too apparent, however, is a demonstrated laxity and failure seriously to undertake the prosecutorial duty to examine government files for requested material that may show that a case against an accused is unfounded. In our land, the attainment of a conviction must never become the sole goal of the prosecution. "(T)he interest of the prosecution is not that it shall win the case, but that it shall bring forth the true facts surrounding the commission of the crime so that justice shall be

done . . .."[1] I thoroughly share the opinion of Judge Hufstedler, written in a cogent dissent about two years ago:

"We should not be hesitant in rigorously applying *Brady* and enforcing that rule even though reversals of criminal convictions may thereby result. The *Brady* rule does not result in the suppression of relevant evidence, but in its disclosure, thereby shoring up the integrity of the fact-finding process."

*United States v. Miller,* 529 F.2d 1125, 1130 (9th Cir. 1976).

I would vacate the convicting judgment and permit Shelton, rightly prepared, to defend himself again.

---

1. *Introduction* to ABA Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge, at 3 (Approved Draft 1972) *cited in United States v. Butler,* 567 F.2d 885, 893 (9th Cir. 1978) (Ely, J., concurring).