IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 2000 Session

## STATE OF TENNESSEE v. JOHN PHILIP NOLAND

**Direct Appeal from the Circuit Court for Cocke County**
**No. 7088, Rex Henry Ogle, Trial Judge**

---

**No. E2000-00323-CCA-R3--CD - Decided**
**August 3, 2000**

This is an appeal by John Philip Noland of his Cocke County conviction for the second degree murder of Mark Goins. The appellant is currently serving a twenty-three year sentence for this offense. He raises as error (1) the trial court's denial of his motion to suppress; (2) the State's violation of Brady v. Maryland; (3) the insufficiency of the evidence; (4) the trial court's refusal to instruct the jury as to the defenses of self-defense and necessity; (5) the trial court's refusal to instruct the jury as to the lesser included offense of criminally negligent homicide; and (6) the length of the sentence imposed by the trial court. After review of the record and the applicable law, we affirm the judgment of conviction. The sentence is modified to reflect a term of eighteen years.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is affirmed; sentence modified.**

DAVID G. HAYES, J. delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. and JOHN EVERETT WILLIAMS, J. joined.

Susanna Thomas, Asst. Public Defender, Newport, Tennessee, for the appellant, John Philip Noland.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Mark A. Fulks, Assistant Attorney General, Al C. Schmutzer, Jr., District Attorney General, and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The appellant, John Philip Noland, was found guilty by a Cocke County jury of the second degree murder of Mark Goins and was sentenced to twenty-three years in the Department of Correction.[1] In this appeal as of right, the appellant raises the following issues:

I. The trial court erred by denying the appellant's motion to suppress his statement

---

[1]The appellant was originally charged by indictment with premeditated first degree murder.

made to law enforcement officials;

II.  The State failed to timely provide defense counsel with all exculpatory evidence pursuant to Brady v. Maryland;

III. The evidence is insufficient to support a conviction for second degree murder;

IV.  The trial court erred by refusing to instruct the jury as to the defenses of necessity and self-defense.

V.  The trial court erred by refusing to instruct the jury as to the lesser included offense of criminally negligent homicide; and

VI.  The trial court improperly applied enhancement factors and failed to apply mitigating factors resulting in an excessive sentence.

After a review of the record and the applicable law, we affirm the judgment of the trial court, but, for reasons discussed herein, the appellant's sentence is modified to reflect a term of eighteen years in the Department of Correction.  This case is remanded to the trial court for entry of judgment consistent with this opinion.

## Background

At approximately 5:00 p.m., on March 15, 1997, Sue Suggs, an employee at Overholt's Hardware in Newport, observed Mark Goins climbing the stairs to an abandoned apartment across the street from the hardware store.  She had observed Goins go to the apartment on previous occasions.[2]  On this occasion, Goins was accompanied by a "person with long hair."  Ms. Suggs remarked to Fred Lee and Hubert Willis "There goes Mark with a girl."  Fred Lee replied, "that's no girl, that's a man."

Upon arriving home at 10:00 p.m. that evening, Lisa Reed, Mark Goins' sister and legal guardian, became worried when she discovered that her brother was not at home.  They began looking for Mark, and, when they could not locate him, notified law enforcement officers.  Mark Goins was twenty-seven years old and was mentally impaired.  Ms. Reed testified that, although he could not maintain regular employment, he did perform odd jobs and ran errands for several businesses in Newport.  His last chore included emptying the trash at Long John Silver's restaurant

---

[2]Early in the investigation, Agent Davenport learned that Mark Goins previously visited the vacant apartment with "at least one other man" and had engaged in sexual activity.

and he would return home around 6:30 p.m.

On Sunday, March 16, Newport Police Sergeant Ronnie Dyke discovered the body of Mark Goins at the abandoned apartment across the street from Overholt's Hardware. TBI Agent Kelly Smith, a member of the Violent Crime Response Team, was called to the crime scene to assist in the investigation. Agent Smith described, "upon entering through the door . . . behind the door . . . there was located the body of the deceased victim." " . . . [T]here was some broken glass and a broken picture frame located on the floor." There was blood on the wall located near the front door. The victim was on his side turned face down and he had some cloth between his hands. In the bedroom, they discovered a bed; blood was located on the bed and on the walls in a number of places.

Dr. Cleland Blake performed the autopsy on the victim. He discovered three stab wounds to the left side of the neck. The largest of the wounds

> went very slightly upward but generally straight into the neck, severed the left carotid artery, the main artery going up the neck and went across the lower end of the voice box at the top of the trachea or the breathing tube. . . .In other words massive hemorrhage into the lungs. That's the lethal wound that caused him to bleed out and drown in his own blood.

The other two wounds were not fatal. Dr. Blake opined that the victim would have survived three to seven minutes from infliction of the fatal wound until he died. The victim's body also evidenced some abrasions and contusions which would have occurred prior to death and were consistent with beating with a fist. Dr. Blake testified as to the presence of sexual activity at the time of death:

> . . . Some sexual activity had been going on with [the victim's penis.] I can't tell you whether it's hand, mouth or whatever but there was mucus draining from the end of the penis and it was swollen and the end of the penis was wrinkled so it had been strutted. It had been fully distended and then had relaxed and the skin was wrinkled over the end of the penis. So some sexual activity had been, he had been involved in some sexual activity.

Dr. Blake was unable to determine a time of death.

TBI Agent David Davenport assisted local authorities in the investigation of Mark Goins homicide. Through his investigation, the appellant was developed as a possible suspect. When Agent Davenport first talked with the appellant, "he told me that he was at the Brown House all day, all evening on Saturday. He was not in Newport, that he lived with June Montgomery and that his truck was torn up and he couldn't come to Newport." Agent Davenport learned later that the appellant had been in Newport on the day of the murder and re-interviewed the appellant five days later, on March 22. On this date, Agent Davenport informed the appellant that Maelon Woods and other witnesses had provided information that the appellant had been in Newport on March 15.[3] The

---

[3]Newport Police Officers Steve Hudson and Mike Hazelwood were on patrol on March 15, 1997. On this date, both officers observed the appellant in Newport a little after 5:00 p.m. He was

appellant conceded that

> he was in Newport last Saturday; it was early, he went to Freddie's Bar looking for Maelon Woods; he drank a beer. . . and that he remembered running into Mark Goins at Freddie's and bumping into him; that he had never talked to him. . . My truck tore up and I parked it in front of the courthouse. I lied to you the last time I talked to you because I thought I was violating my probation for getting convicted for DWI the day before in Court in Cocke County.

The appellant maintained that he did not know anything about the murder of Mark Goins. Agent Davenport then began presenting the appellant with hypothetical scenarios, *i.e.*, what if the appellant's hair, blood or fingerprints were found at the crime scene. At this point, the appellant hung his head and said "yes, he'd been in there and that he had stabbed the Goins boy."

The appellant then provided the following statement, which was reduced to writing by Agent Davenport:

> Last Saturday, March the 15th, 1997, I came to Newport driving my truck. I got here kind of early. My truck broke down and I had to leave it in front of the Courthouse. I walked downtown to Freddie's Bar looking for Maelon Woods. I drank some beer at Freddie's Bar. . . . When I got ready to leave I ran into Mark Goins and we spoke. I had seen him around town before but didn't really know him. I looked for Maelon some more. I run into Mark again. I said, hey, man, can you help me push my truck off. He mumbled something and we started walking toward the Courthouse. Mark said he had to go up to the apartment. He was carrying something in his hands, looked like a sack or something. I followed him upstairs to an apartment. We went into a room and I sat down on a mattress in there. It was still daylight. I thought the boy was going to change clothes or something. I guess I laid down and passed out. When I came to the boy had my britches down and unzipped. He was sucking my dick. I had a Case Sodbuster knife in my right front pocket. . . . I just lost it when I woke up and found Mark sucking my dick. I took the knife out and started stabbing him. I don't know how many times I stabbed him. The boy was naked when I woke up and he was on top of me sucking my dick. When I stabbed him he jerked. He tried to hold on to me and I stabbed him again. I got my britches on and got the hell out of there. I went back downtown, found Maelon and he came up and helped me start my truck. We had to push it off. I went back to the Brown House. I gave the knife I used to "Whopper" that lives on Fines Creek in North Carolina. This was the other night. The clothes I had on I threw in the French Broad River sometime Sunday at J.P.'s Campground. I threw the work boots I had on in the dumpster across from Miss Murr's store. I didn't mean to kill this boy. I just don't like gay people. I didn't find out he was dead until Sunday morning. I didn't mean to kill

observed with Maelon Woods in the alley between Woodlawn Avenue and McMahan Street. Thomas Webster also observed the appellant in Newport on the date of the murder; he observed the appellant walking toward the courthouse yard with the victim.

him. I just wanted him to get the hell away from me. . . .

"Whopper" was determined to be Thomas Rathbone.[4] He was located and the knife was handed over to law enforcement officers and sent to the Crime Laboratory.

Special Agent Forensic Scientist Emily Samera Zavaro examined the knife for the presence of blood. Although human blood was present, there was an insufficient amount of the substance from which to obtain a DNA profile type.

Based upon this proof, the jury found the appellant guilty of second degree murder.[5]

## I. Motion to Suppress

A hearing on the appellant's motion to suppress statements made to law enforcement officers was heard by the trial court on December 7, 1998. TBI Special Agent David Davenport testified that he interviewed the appellant on March 17, 1998. At this time, the appellant was not under arrest, had not been charged with any offense, and had arrived at the station voluntarily. During this first interview, the appellant denied having been in Newport on the date of the murder. The appellant then left the station. Agent Davenport again talked with the appellant on March 22. The appellant was in the Cocke County jail at this time on an unrelated charge. On this occasion, Agent Davenport advised the appellant of his constitutional rights and the appellant signed a waiver of rights form. During this statement, the appellant admitted to being in Newport on the date of the murder and to seeing the victim on that date. He explained that he had lied about being in Newport previously because he was concerned that his probation might be violated. Twenty minutes later, the appellant provided a third statement, confessing to the murder of Mark Goins. Agent Davenport testified that at no time on March 22nd did the appellant invoke his right to an attorney. The appellant never asked for an attorney, he never indicated that he could not read or write, or that he could not read the written statement. Agent Davenport went over the statement "verbatim with the appellant, each word, and gave him the opportunity to read it as we read it. He said he understood it. He signed it on each page, initialed all corrections."

The appellant testified that, on March 21, 1997, he was in the Cocke County jail finishing a forty-eight hour sentence on a DUI conviction. While serving this sentence, Agent Davenport and two other officers removed the appellant from the jail and took him to a room in the police station. Agent Davenport began questioning the appellant about being in Newport and killing Mark Goins. He stated that Agent Davenport threatened him with the electric chair. The appellant denied that

_____

[4] Thomas Rathbone committed suicide prior to the commencement of the appellant's trial.

[5] After the State rested, the defense moved for a judgment of acquittal as to premeditated murder. After lengthy argument by counsel and careful consideration by the trial court, the court granted the motion for judgment of acquittal as to the charge of premeditated murder.

-5-

Agent Davenport ever advised him of his rights, including his rights to cease questioning and have a lawyer present. The appellant stated that he told the officers that "if I need one [an attorney] I want one but I can't afford one." After they questioned him, he asserts that they showed him a paper and told him to sign it. He stated that Agent Davenport instructed the appellant that this was his statement and that if he signed it he could go home after forty-eight hours. The appellant testified that, although he did sign and initial it, he could not read the statement. The appellant explained that the contents of the statement transcribed by Agent Davenport were misleading and not an accurate reflection of the interview session. In maintaining that he could not read and write, the appellant explained that he was carrying a book "to look at the pictures in it."

The appellant's girlfriend, June Montgomery, testified that the appellant could not read. She explained that the book that the appellant carried with him was "more like a security blanket." She stated that the book contained pictures of Native Americans, a subject of interest to the appellant. Likewise, the appellant's sister, Christine O'Dell, confirmed that the appellant cannot read and write. She stated that the appellant was unable to attend public school and was sent to a special school.

Based upon this evidence, the trial court made the following findings of fact and conclusions of law:

> . . . Mr. Noland does have some difficulties in communicating. It is obvious that he is not an extremely well educated gentleman and certainly that is no reflection upon him.

> But the Court has to look first of all at the totality of the circumstances under which these statements were given. . . .

> Based upon the credibility of the witnesses in this case and comparing the testimony obviously there is divergence in testimony. But the Court finds that Officer Davenport at the time the statements were given did advise the defendant of his Constitutional rights and took these statements from him. In order to accept the defendant's version of the statement . . . I would have to find the statement was entirely made up by Officer Davenport. And I find that at this juncture at least to be incredible that Officer Davenport simply made all this up.

> And so the Court finds that the defendant voluntarily waived his right to counsel after being fully advised of his rights and that he voluntarily made this statement and that he voluntarily signed that statement after having been read his Constitutional rights.

> Now obviously each person has different mental abilities. That is clear. But I don't think that the officers have an obligation to conduct or to have conducted a psychiatric examination prior to taking someone's statement. That's not the purpose of the Fifth Amendment. Now certainly someone with mental disabilities it might affect what they understood about it, but again it's the duty of the officers to advise those people, each individual defendant before they ask them questions and before

they take a statement. And the Court is satisfied that Officer Davenport did exactly as he testified.

And therefore the Motion to Suppress the statements is respectfully overruled.


The appellant contests the ruling of the trial court asserting that he could not have knowingly and intelligently waived his <u>Miranda</u> rights because of his impaired mental ability. Furthermore, the appellant argues that, regardless of its admissibility, the statement procured by Agent Davenport is unreliable (1) due to Agent Davenport's "misleading statements" of the evidence resulting in a confession obtained by deception and (2) because the statement was transcribed in a careless and incomplete manner.

Prior to custodial questioning, law enforcement officials must warn a suspect of his right to remain silent, his right to assistance of counsel during interrogation, and the consequences of waiving those rights. <u>See</u> <u>Arizona v. Miranda</u>, 384 U.S. 436, 467-73, 86 S.Ct. 1602, 1624-27 (1966). To establish a valid waiver of these <u>Miranda</u> rights, the State must prove by a preponderance of the evidence that a <u>Miranda</u> warning was given and that the defendant understood his rights. <u>State v. Bush</u>, 942 S.W.2d 489, 500 (Tenn.), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376 (1997). To be constitutional, a waiver must be made with a "requisite level of comprehension," such that an individual has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141 (1986); <u>State v. Stephenson</u>, 878 S.W.2d 530, 544-45 (Tenn. 1994) (citing <u>Fare v. Michael C.</u>, 442 U.S. 707, 99 S.Ct. 2560 (1979); <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75, 99 S.Ct. 1755 (1979)). In determining whether a defendant understood his rights, a court must consider the totality of the circumstances, including the defendant's experience, education, background, intelligence or capacity to understand the warnings and the meaning of a waiver. <u>See generally</u> <u>Bush</u>, 942 S.W.2d at 500.

In reviewing the denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the State as the prevailing party. <u>State v. Daniel</u>, 12 S.W.3d 420, 423 (Tenn. 2000) (quoting <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. <u>Daniel</u>, 12 S.W.3d at 423. Indeed, these findings will be upheld unless the evidence preponderates otherwise. <u>Id.</u> Although deference is given to the trial court's findings of fact, this court conducts its own appraisal of the constitutional questions presented by reviewing the law and applying it to the specific facts of the particular case. <u>Id.</u> (citing <u>State v. Yeargan</u>, 958 S.W.2d 626, 629 (Tenn.1997); <u>Beare v. Tennessee Dept. of Revenue</u>, 858 S.W.2d 906, 907 (Tenn. 1993)).

From our review of the record, we cannot conclude that the evidence preponderates against the trial court's determination that the appellant's waiver was voluntary. Agent Davenport testified

that the appellant appeared to understand his <u>Miranda</u> rights and the waiver; the appellant testified to the contrary. The trial court resolved the credibility issue against the appellant. Moreover, despite testimony of the appellant's illiteracy, mental disability, and educational background; these factors do not, in and of themselves, render the appellant's statement involuntary. <u>See</u> <u>State v. Perry</u>, 13 S.W.3d 724, 738 (Tenn. Crim. App.), <u>perm. to appeal denied</u>, (Tenn. 1999) (citing <u>State v. Bell</u>, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985); <u>State v. Greer</u>, 749 S.W.2d 484, 485 (Tenn. Crim. App. 1988); <u>State v. Kelley</u>, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances. In the present case, the appellant never indicated that he could not read or write, Agent Davenport reviewed the transcribed statement with the appellant, the appellant was given the opportunity to review the statement and make any corrections, and he signed the statement. Moreover, the appellant explained the fallacy of his initial statement by stating his concern with violating conditions of his probation. The appellant's actions indicate that he understood that he was involved in an adversarial process and that if he had something to hide, he could protect himself by not speaking. Although the record does not show the full extent of the appellant's cognitive abilities, it does show that the appellant had the kind of concrete understanding of his rights necessary for an intelligent and voluntary waiver. The trial court made a common sense ruling based on a preponderance of credible evidence that the appellant knowingly and intelligently waived his rights to remain silent and to the assistance of counsel. The law does not require more.

The appellant also asserts that his statements should not have been admitted because they were obtained by deceptive interrogation tactics. Specifically, he contends that Agent Davenport induced him into making inculpatory statements by misleading him regarding the evidence against him. Agent Davenport testified that, during the interrogation, he informed the appellant that "Maelon Woods had positively identified him as being in town on Saturday." He then continued to "la[y] out some scenarios of what ifs, what if you had been seen going upstairs, . . . what if your fingerprints appear in that room . . .," "[w]hat if we find your semen in that apartment, what if we find your hair in that apartment." Agent Davenport finally informed the appellant that he did not believe him. At this point, the appellant hung his head down and confessed.

In addition to being knowing, the "relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion, or deception." <u>Stephenson</u>, 878 S.W.2d at 544-45; <u>Perry</u>, 13 S.W.3d at 738. Agent Davenport's hypothetical statements did not amount to deceptive, coercive, or intimidating tactics and did not induce the appellant to relinquish his <u>Miranda</u> rights. First, the appellant voluntarily waived his <u>Miranda</u> rights prior to being presented with the factual scenarios presented by Agent Davenport. Thus, the statements had no effect on the appellant's waiver. Moreover, the hypotheticals were based upon physical evidence found at the crime scene and were not merely "in the imagination of the interrogator." <u>See</u> <u>State v. Howard</u>, 617 S.W.2d 656, 659 (Tenn. Crim. App. 1981). This issue is without merit.

Finally, the appellant asserts that the statement is incomplete in that it was "not fully memorialized at the time it was taken" and "because its unreliability is obvious on its face." Again,

the appellant orally provided a statement to Agent Davenport. Davenport reduced the statement to writing, read "verbatim" the statement to the appellant and provided the appellant the opportunity to review and make corrections to the statement. The appellant signed the first and second pages of the statement, initialed the beginning and ending of the writing on each page, initialed the corrections within the statement, and signed the end of the statement. Thus, the appellant acquiesced in the accuracy of the statement and adopted it as his own statement by signing each page. See generally People v. Ventura, 673 N.Y.S.2d 106, 107 (N.Y. App. Div. 1998). This issue is without merit.

## II. Brady Violation

The appellant's trial commenced on December 8, 1998, twenty-one months after his arrest. On December 3, 1998, defense counsel was "provided with a quantity of information out of Agent Davenport's investigation file. . . ." Included in this information was the statement of Jack Hill.[6] Mr. Hill indicated that he had seen the victim in his business after the time the State alleged he was killed by the appellant. The State responded that all reports resulting from the investigation from the crime scene were reported to defense counsel as soon as they received the reports. Indeed, defense counsel was provided the information five days prior to trial at the same time the prosecutor's office became aware of the material. The issue was brought to the court's attention and an instanter subpoena issued for Jack Hill. Jack Hill testified that he saw the victim in the Woodlawn Café at 6:00 p.m. on Saturday, March 15. The appellant concedes that this testimony "negat[ed] prejudice to the appellant's case."

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), the Supreme Court held that the prosecution has a duty to furnish the defendant with exculpatory evidence relating either to the defendant's guilt or innocence or to the potential punishment that may be imposed. To establish a Brady violation, the appellant must show by a preponderance of the evidence three essential elements which include (1) the suppression of the information by the State; (2) the evidence was favorable to the defendant; and (3) the evidence was material. See State v. Edgin, 902 S.W.2d 387, 389-390 (Tenn.), as amended on reh'g, (1995). In the present case, the alleged Brady material was disclosed to defense counsel prior to trial. Thus, the first prerequisite is not satisfied. Additionally, we would be constrained to conclude that the information was either exculpatory or material. The witness' statement placed the victim at a business after the alleged time of his murder. The time of death was not a critical issue in the State's prosecution as the appellant did not rely upon an alibi defense. Moreover, the statement does not absolve the appellant's liability for the murder. Thus, we fail to find a violation of Brady.

Although the appellant, in essence, admits that no constitutional violation occurred, he "urges this Court to reaffirm the State's obligation to provide exculpatory information in a timely fashion."

---

[6] Prior to the commencement of trial, defense counsel requested a continuance in order to competently review and investigate this material. This motion was denied.

"Tardy disclosure of <u>Brady</u> material is generally not reversible error unless the defendant can show that he was denied a fair trial." <u>United State v. Gordon</u>, 844 F.2d 1397 (9th Cir. 1988); <u>United States v. Shelton</u>, 588 F.2d 1242 (9th Cir. 1978), <u>cert. denied</u>, 442 U.S. 909, 99 S.Ct. 2822 (1979). A delay in disclosing <u>Brady</u> material requires reversal only if "the lateness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." <u>Shelton</u>, 588 F.2d at 1247. In the present case, defense counsel received the information five days prior to trial. The trial court was made aware of defense counsel's concerns and issued an instanter subpoena for the witness. The witness testified at trial consistent with his prior statement. Accordingly, even if we were to find the statement exculpatory and material, we conclude that the lateness of the disclosure did not prejudice the appellant's preparation of his defense. This issue is without merit.

### III. Sufficiency of the Evidence

The appellant next complains that the evidence introduced at trial is insufficient to support his conviction for the second degree murder of Mark Goins. Specifically, he contends that (1) the State failed to prove the essential elements of second degree murder and (2) the State failed to prove the identity of the perpetrator beyond a reasonable doubt.

Tennessee Rule of Appellate Procedure 13(e) provides that findings of guilt "shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." <u>See also</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979). The jury conviction removes the presumption of innocence from the defendant and replaces it with one of guilt; thus, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn.1982). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Harris</u>, 839 S.W.2d 54, 75 (Tenn.1992), <u>cert. denied</u>, 507 U.S. 954, 113 S.Ct. 1368 (1993). This court may not reweigh or reevaluate the evidence. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn.1978). These principles are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App.1990).

The appellant asserts that none of the physical evidence collected at the crime scene identified him as the perpetrator. Additionally, he contends that the State failed to produce an eyewitness who could conclusively identify the appellant as the long-haired individual accompanying the victim to the abandoned apartment on the date of the murder. Essentially, he argues that the evidence adduced during trial is contrary to the appellant's confession dated March 22, 1997. The identity of the defendant as the perpetrator is certainly an indispensable element of any crime. The evidence offered to prove identity, however, can be either direct or circumstantial. <u>State v. Thompson</u>, 519 S.W.2d 789, 793 (Tenn.1975); <u>State v. Shelley</u>, 628 S.W.2d 436, 438 (Tenn. Crim. App.1981). Indeed, in the case *sub judice*, identity was proved not only circumstantially, but also most directly by the appellant's confession, which left very little to speculation. <u>See</u> <u>Monts v. State</u>,

379 S.W.2d 34, 40 (Tenn. 1964) (confession is direct evidence of guilt). Thus, the evidence establishing the appellant as the perpetrator of the murder is more than sufficient.

Finally, in order to obtain a conviction for second degree murder, the State is required to prove that the appellant caused the knowing killing of another. See Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (1997). In his confession, the appellant related, "I took the knife out and started stabbing him. I don't know how many times I stabbed him. . . . When I stabbed him he jerked. He tried to hold on to me and I stabbed him again." This proof is sufficient for a rational trier of fact to conclude that the appellant was consciously aware of the nature of his conduct and that the conduct was reasonably certain to cause death. Accordingly, we find the evidence more than sufficient to support his conviction for second degree murder. This issue is without merit.

## IV. Failure to Instruct Jury as to Defenses of Justification and Necessity

The appellant contends that the trial court erred by refusing to instruct the jury as to the defenses of self-defense and the defense of necessity. At trial, the appellant requested that the court charge the jury on these defenses. The court denied the appellant's requests, finding that there was no proof offered to raise self-defense or necessity as legitimate defenses in this case.

Every defendant has the right to have every issue of fact raised by the evidence and material to his or her defense submitted to the jury on proper instructions. Tenn. Code Ann. § 39-11-203(c) (1997);Tenn. Code Ann. § 39-11-204(d) (1997); see also State v. Jones, 889 S.W.2d 225, 229 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.1994). "[T]o determine whether a statutory defense is fairly raised by the proof so as to require its submission to the jury, a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998), perm. to appeal denied, (Tenn. 1999) (citing State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App.1993)).

In order to establish a claim of self-defense, a defendant must show that the danger of death or serious bodily harm was imminent and impending, manifested by some words or overt acts at the time clearly indicative of a present purpose to do injury.[7] Tenn. Code Ann. § 39-11-611 (1997). See also State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App.1993). Similarly, to establish a claim of necessity, a defendant must show that he reasonably believed his conduct necessary to avoid

_____

[7] Our current criminal code treats "self-defense" as justification for conduct that otherwise would constitute an offense. Thus, the actor's conduct is "justified" or thought to be right. See MODEL PENAL CODE § 3.01.

imminent harm and where the harm sought to be avoided is clearly greater than the harm caused by the criminal act. See Tenn. Code Ann. § 39-11-609 (1997); Sentencing Commission Comments, Tenn. Code Ann. § 39-11-609.

The evidence in the present case does not raise an inference requiring an instruction on self-defense. There is no proof that the appellant believed there was the danger of imminent death or serious bodily injury based upon the victim's actions of sexual assault upon the appellant. Moreover, we conclude that the defense of necessity was not fairly raised. The appellant's confession dispels any finding that the appellant believed that he was threatened by imminent harm. Moreover, we would only find rare occasions, of which this is not, where the harm sought to be avoided, *i.e.*, a sexual assault, is greater than the harm caused by the criminal act, *i.e.*, death. Thus, there was no error in the trial court's refusal to give such a charge.

### V. Lesser Included Offense

The appellant additionally complains that the trial court's refusal to instruct the jury as to the lesser included offense of criminally negligent homicide constituted reversible error. Under Tennessee law, the trial court has the statutory duty to charge the jury as to the law of each offense "included" in an indictment. See State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (citing Tenn. Code Ann. § 40-18-110 (1997)). Thus, the focus becomes what offenses are lesser included offenses of the offense charged in the indictment. Our supreme court has provided the following definition of a lesser included offense:

An offense is a lesser included offense:

(a) if all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property, or public interest; or

(c) it consists of . . . facilitation of the offense charged . . . ; an attempt to commit the offense charged . . .solicitation to commit the offense charged.

Burns, 6 S.W.3d at 466-467.

-12-

Criminally negligent homicide is defined as "criminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a) (1997). Second degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210. Our criminal code defines the mens rea of criminal negligence as occurring if a person acts intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-11-301(a)(2) (1997). Therefore, "an offense that requires that the accused act knowingly necessarily includes offenses in which the accused's mental state was one of criminal negligence." See State v. Lynn, 924 S.W.2d 892, 899 (Tenn. 1996). Accordingly, criminally negligent homicide is a lesser included offense of second degree murder under part (a) of the Burns test. See generally State v. Jumbo Kuri, No. M1999-00638-CCA-R3-CD (Tenn. Crim. App. at Nashville, May 25, 2000)(criminally negligent homicide lesser included offense of second degree murder); State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (Tenn. Crim. App. at Jackson, Mar. 14, 2000) (criminally negligent homicide lesser included offense of second degree murder). This determination, however, is not conclusive that the evidence justifies a jury instruction on such lesser offense.

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

Burns, 6 S.W.3d at 469.

> Under Tennessee law, "criminal negligence'
>
> refers to a person who acts with criminal negligence with respect to the circumstances surrounding the person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(4) (1997). The focus in a criminal negligence prosecution is the *failure to perceive the risk* created by the defendant's conduct. See generally Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975). Indeed, the offense of criminally negligent homicide involves three elements: (1) the defendant's creation of a substantial and unjustifiable risk that the death of another person would occur; (2) the defendant failed to perceive such substantial and unjustifiable risk; and (3) the defendant's failure to perceive the risk was so negligent as to constitute in law a gross deviation from the standard of care that a reasonable person would observe in the same situation. The distinction between criminal negligence and the mental states of intent, knowledge,

-13-

and reckless, is that the latter involve an awareness of the harm which will (or in some degree probably will) result from the person's acts, whereas negligence involves the failure to be aware of probable results in a situation in which the person has a legal duty of awareness. In the present case, the proof, in the light most favorable to the existence of the lesser-included offense, reveals that the appellant woke up to find the disrobed victim on top of him performing fellatio. The appellant admitted that he "lost it," took his "knife out and started stabbing him." It is clear from the facts of this case that the appellant created the risk of death, thereby satisfying element (1); however, it is equally clear that, in reference to the second element, the action of the appellant stabbing the victim in the throat demonstrates that the appellant perceived the risk but also shows that he was aware that his conduct was reasonably certain to cause the death of the victim. Thus, contrary to the appellant's contention, we conclude that the trial court did not err in not submitting an instruction to the jury upon the offense of criminally negligent homicide. This issue is without merit.

## VI. Sentencing

In his final challenge, the appellant avers that the trial court improperly considered and applied statutory enhancing factors and failed to apply statutory mitigating factors in sentencing him to serve a sentence of twenty-three years in the Department of Correction. He contends that the trial court's application of enhancement factor (4), the victim was particularly vulnerable, Tenn. Code Ann. § 40-35-114(4) (1997), is unsupported by the record and that application of enhancement factor (9), use of deadly weapon during commission of the offense, Tenn. Code Ann. § 40-35-114(9), is erroneous. Moreover, he contends that the trial court failed to properly consider and weigh in mitigation factors which should have resulted in a lesser sentence. Specifically, the appellant submits that the court failed to consider the following mitigating factors: (2) the appellant acted under strong provocation and (3) substantial grounds exist tending to excuse or justify the defendant's criminal conduct though failing to establish a defense. See Tenn. Code Ann. § 40-35-113 (2); -113(3) (1997).

Review, by this court, of the length, range, or manner of service of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d) (1997). See also State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). Thus, this court may only modify a sentence if the sentence is excessive or the manner of service is inappropriate. State v. Russell, 773 S.W.2d 913, 915 (Tenn.1989). Moreover, on appeal, the appellant bears the burden of showing that the sentence imposed was improper. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-401(d).

At the sentencing hearing, Lisa Reed, the victim's sister, testified that her brother was more like a son to her. After their mother died, Ms. Reed was given the responsibility of raising her brother who had been mentally handicapped from birth. She testified that the twenty-seven year old victim "was like a little kid. He never hurt nobody. He thought everybody loved him . . . He thought nobody would ever hurt him. And he done anything for anybody that he could."

Christine O'Dell testified that she is the appellant's older sister. She stated that there were seven children in the family. She explained that the appellant "wasn't like the rest of the kids. He couldn't . . . cope." He was unable to attend public school and eventually was sent to Daniel Arthur Rehabilitation School for mentally retarded and handicapped kids. She added that he never learned to read and write very well. Unable to secure employment, the appellant performs mostly odd jobs; Ms. O'Dell described the appellant as "a jack of all trades and the master of none." She further admitted that the appellant liked to drink alcohol and had been convicted of DUI.

In arriving at its sentencing determination, the trial court made the following findings:

. . .

. . . [T]he Court does find that because of his peculiar situation, because of his handicap that he was an especially vulnerable victim. Now obviously you do not have to be vulnerable to be killed. . . . if a victim is particularly vulnerable. They don't want these people, these types of people hurt and so they very reasonably make that an Enhancement factor and the Court so finds.

And certainly the Court does find that the defendant by the statement that was attributed to him did use a deadly weapon, to-wit a knife.

The Court in looking at the suggested mitigating factors . . . And the Court does reject that any alleged acts of the victim constituted strong provocation. The Court finds that there is no strong provocation in this case, especially looking at the number of wounds and the manner of the crime itself certainly does not indicate strong provocation caused by any act of the victim. There is no justification for this type of criminal conduct. . . .

Now, certainly he like the victim has had some mental problems and the Court does take that into consideration. He is obviously, he isn't at a hundred percent. He has some problems communicating and the Court takes that into consideration in talking about that he does suffer somewhat from a mental problem. And I've recognized that. . . .

Starting in the mid-range as required by the statute and having weighed all of the enhancement factors and I certainly I do think, especially the vulnerability of the victim is an overriding factor in this case. This young man was as I say a street child in so many words and I think it was especially easy to take advantage of this situation. I don't know what happened up there, I don't know that we will ever know other than someone got tragically killed. . . .

And taking into consideration that the defendant does have some limitations the court thinks that the appropriate sentence is twenty-three years in the State penitentiary.

A. Enhancement Factors

The trial court found two enhancement factors applicable: (4) the victim was particularly vulnerable and (9) the defendant possessed a deadly weapon during the commission of the crime. Tenn. Code Ann. § 40-35-114(4), -114(9). The use of a deadly weapon is not an element of the offense of second degree murder. See Tenn. Code Ann. § 39-13-210. This court has ruled that enhancing a murder sentence for the use of a deadly weapon is permissible. State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App.1994). The court properly applied factor (9).

Our supreme court has provided guidance in assessing whether the State had met its burden in establishing the vulnerability of the victim. Specifically, the reviewing court should consider whether evidence in the record with regard to the victim's age or physical or mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997) (quoting State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993) (emphasis added; citations omitted)); see also State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996). The evidence need not be extensive; nonetheless, the State must prove the factor is applicable. Id. Moreover, the court must consider the nature of the offense and the manner in which it was committed. Id. In other words, an offense may be committed in such a manner as to make the victim's vulnerability irrelevant. Id. See, e.g., Butler, 900 S.W.2d at 305 (defendant shot and killed elderly woman; held, although victim had physical disability and walked with a cane, State failed to show victim's vulnerability because no victim could have resisted the offense committed in that manner). In short, the court must consider all of the facts and circumstances of the offense in determining whether the particular vulnerability factor is appropriate for the offense. Poole, 945 S.W.2d at 97.

In the present case, the State presented testimony that the victim was mentally handicapped. His sister/guardian testified that the victim thought everyone loved him and that nobody would hurt him. Although the victim was twenty-seven years old, his sister regarded him as a child. We acknowledge the victim's mental impairment and his naivety. However, under the guidance provided by our supreme court, we cannot conclude that Mark Goins' mental impairment was a factor in his victimization in this case. Rather, the proof shows that it was the victim who led the appellant, also mentally impaired, to the apartment and it was the victim who disrobed and initiated sexual contact with the appellant. Based upon the victim's active participation in the events prior to his death, we are unable to conclude that the victim's mental disability made him particularly vulnerable to the offense committed. Accordingly, we find application of enhancement factor (4) is error.

B. Mitigating factors

The appellant argues that (2) he acted under strong provocation and (3) his conduct is justified although failing to establish a defense. Tenn. Code Ann. § 40-35-113(2); -113(3). He asserts that these factors are apparent from the proof developed at trial. We agree with the trial court's finding that the appellant's conduct was not justified as provided by mitigating factor (3).

-16-

With reference to the assertion of factor (2), provocation, the facts reveal that the appellant accompanied the victim to an abandoned apartment. The appellant, who had been drinking earlier that day, "passed out" on a bed. When he awoke, the victim had "my britches down and unzipped" and was naked on top of him performing fellatio. At this point, the appellant punched the victim in the face, reached for his knife and stabbed the unarmed victim three times in the neck. The appellant stated that he "just wanted him to get the hell away from me. . . ." The medical examiner's report confirms that the victim was involved in "some sexual activity" at or near the time of the victim's death." Upon *de novo* review, we find that the evidence preponderates against the trial court's finding that provocation, for sentencing purposes, was not established. BLACK'S LAW DICTIONARY defines provocation as "conduct or actions on the part of one person towards another as tend to arouse rage, resentment, or fury in the latter against the former, and thereby cause him to do some illegal act against or in relation to the person offering the provocation . . . There must be a state of passion without time to cool placing defendant beyond control of his reason. . . ." BLACK'S LAW DICTIONARY 1103 (1990 6th ed.). We find that the facts of this case fit this definition of provocation and, although not excusing culpability for the senseless homicide, nonetheless, provides the motivation for the appellant's conduct. Accordingly, the court erred by failing to apply mitigating factor (2).

C. Weighing of Enhancement and Mitigating Factors

When there are enhancement factors and mitigating factors, the trial court, for a class A felony, must start at the midpoint in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(c), (e) (1997). For a range I standard offender convicted of second degree murder, the sentencing range is fifteen to twenty-five years.[8] See Tenn. Code Ann. § 39-13-210; Tenn. Code Ann. § 40-35-112(a)(1) (1997). Because the appellant was convicted of a Class A felony, the starting point for sentencing purposes is twenty years, which is the midpoint in the range. Tenn. Code Ann. § 40-35-210(c). The trial court imposed a twenty-three year sentence. However, we have concluded that application of enhancement factor (4) was error. One enhancement factor, use of a deadly weapon, and two mitigating factors, appellant's mental condition and provocation,[9] remain. In view of our finding that the trial court misapplied enhancing factor (4) and failed to apply mitigating factor (2), modification of the twenty-three year sentence is necessary. Upon *de novo* review, after weighing the remaining enhancement factor and the statutory mitigators, we conclude that a sentence of eighteen years is justified.

---

[8] The trial court sentenced the appellant as a range I standard offender. We note that the court set the appellant's release eligibility date at 100% pursuant to Tenn. Code Ann. § 40-35-501(i)(1) and (2) (1997).

[9] It is unclear from the trial court's findings as to which mitigating factor is supported by his statement that the appellant suffers from "a mental problem." Notwithstanding, we believe that this finding is supported by the record and requires mitigation consideration under Tenn. Code Ann. § 40-35-113(8).

After review of the record, we affirm the appellant's conviction for second degree murder. However, upon *de novo* review of the appellant's sentence, we modify the sentence imposed by the trial court from twenty-three years to eighteen years to be served in the Department of Correction. This case is remanded to the trial court for entry of an order modifying the sentence in the manner consistent with this opinion.

_____
DAVID G. HAYES, JUDGE